**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Rachael Palecek,<br><br>              *Plaintiff,*<br><br>  *vs*<br><br>Mayo Clinic Health System—Northwest Wisconsin Region, a Wisconsin non-stock corporation,<br><br>             *Defendant*. | Court File No. 23-cv-1460<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rachael Palecek ("Plaintiff Palecek), makes the following allegations for her complaint against the Defendant Mayo Clinic Health System—Northwest Wisconsin Region ("Defendant Mayo Northwest" or "Defendant").

**INTRODUCTION**

1.      In October, 2021, Defendant Mayo Northwest mandated that all of its employees receive the Covid-19 vaccination as a condition of continuing their employment ("Vaccine Mandate").  Many of Defendant's employees, including Plaintiff, objected to receiving these vaccinations because of their sincerely-held religious beliefs. Plaintiff filed a request for a religious exemption with Defendant to be exempt from taking the Covid-19 vaccination.  Defendant denied the requested exemption.  In addition, Defendant failed to undertake an individual interactive process as required for evaluating religious exemption requests.  Finally, only a couple of weeks after

terminating Plaintiff, Defendant reversed the testing program part of its Vaccine Mandate, demonstrating that the termination was unnecessary or a pretext.

2.      Based on Defendant's implementation of the Vaccine Mandate and its refusal to grant Plaintiff her request for a religious exemption, Plaintiff brings these claims under Title VII for religious discrimination, and breach of contract, based on Defendant Mayo mandating a vaccine.

## JURISDICTION AND VENUE

3.      Plaintiff has fulfilled the jurisdictional requirements of Title VII of the Civil Rights Act of 1964, including filing of Charges with the EEOC or the Wisconsin Department of Workforce Development Equal Rights Division, and the receipt of a right-to-sue letter from Equal Employment Opportunity Commission ("EEOC") or Wisconsin Department of Workforce Development Equal Rights Division following closure of the EEOC file, all in compliance with 42 U.S.C. §2000e-5(f)(1).

4.      This Court has original subject matter jurisdiction over this case, as it raises claims pursuant to federal statute, pursuant to 28 U.S.C. §1331. This Court further has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

5.      This Court has personal jurisdiction over Defendant Mayo as it is a non-stock corporation operating in and located in the State of Wisconsin and its parent corporation is located in the State of Minnesota.

6.      Defendant Mayo Northwest is subject to the provisions of Title VII because Defendant Mayo employs more than fifteen employees in each of twenty or more

2

calendar weeks in the current or preceding calendar year under 42 U.S.C. §2000e (b) and 42 U.S.C. §12111 (5)(A).

7.    Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(e)(1) because the actions giving rise to this cause of action either occurred in Minnesota, or Defendant conducts business in the State of Minnesota through its parent corporation.

## PARTIES

8.    Plaintiff Palecek is a Wisconsin resident who worked for Defendant Mayo Northwest for nearly eight years in the Inpatient Psychiatry and Psychology Department, and most recently as a behavioral health social worker.

9.    Defendant Mayo is a Wisconsin non-stock corporation which operates medical facilities in Wisconsin, under the direction and control of its parent corporation in Minnesota.

## FACTS

10.    During the pandemic in 2020 and 2021, Plaintiff worked diligently, including in patient care areas, while unvaccinated, to perform all duties Defendant Mayo requested of her.

11.    When Covid-19 vaccines first became available in December 2020 Defendant encouraged, but did not require its employees to get vaccinated, and Plaintiff continued to work throughout 2020 and 2021 while unvaccinated.

12.    Defendant recognized in November 2020, in the words of Dr. Gregory Poland, head of Mayo's Vaccine Research Group, that "*we can't mandate that people take a vaccine, it's their right not to take one*."

3

13.     Again in December 2020 Defendant recognized that "*vaccination is voluntary*."

14.     Defendant also recognized that some of its employees would have religious objections to taking the vaccine, and accordingly, Defendant had a policy until September 2021 of granting all or nearly all requests for religious exemptions.

15.     In litigation in October 2021, Defendant Mayo and its parent and related companies boasted that they granted 90% of requests for religious exemptions, and because they were so lenient in granting requests for religious exemptions, the Defendant argued that the Plaintiffs in that case had no standing because it was unlikely they would be terminated or would suffer any negative consequences as a result of Defendant's Vaccine Mandate.

16.     Defendant recognized the important work that all of its employees were doing—the unvaccinated and the vaccinated—and on September 28, 2021 the President and CEO of Mayo Clinic (Gianrico Farrugia, M.D.), along with the Chief administrative Officer (Jeff Bolton) wrote to Mayo's employees:

> *On behalf of the leaders of Mayo Clinic's sites and shields, thank you for the compassionate care you provide to our patients, your excellent service to Mayo Clinic, and the supportive and collaborative environment you create for all of our colleagues. We truly appreciate you and your efforts to live our values every day.*

17.     However, just two weeks later, Defendant implemented its Vaccine Mandate. The Vaccine Mandate stated that "*all Mayo Clinic staff members*" must get vaccinated with one of the Covid-19 vaccines or else the employees would be considered "*noncompliant,*" later "*placed on unpaid leave,*" and eventually "*terminated.*" The

4

Vaccine Mandate applied to "*all staff, including remote workers*," of which Defendant had many.  Recognition of the important work performed by the unvaccinated employees disappeared only two weeks after being celebrated.

18.    Defendant announced the Vaccine Mandate on October 13, 2021. Defendant's changed policy required all staff to become vaccinated against Covid-19, and that if they were not already vaccinated or only partially vaccinated, they would have to become vaccinated or be approved for a medical or religious exemption by December 3, 2021, or be terminated.

19.    On October 25, 2021 Defendant sent a communication to their employees outlining the steps to comply with the Covid-19 vaccination policy.  Beginning on December 3, 2021, Defendant issued Final Written Warnings to noncompliant staff with instructions on complying by January 3, 2022, or be terminated.

20.    Defendant announced that there were both medical and religious exemptions from the Vaccine Mandate, and did allow for employees to apply for "medical and religious exemptions" to the Vaccine Mandate, and even provided "forms" for such applications.

21.    However, what Defendant gave with one hand, it took away with the other by proclaiming that "*it is anticipated that a small number of staff will have qualifying religious exemption*."  (emphasis added).  Further, Defendant declared: *"[o]nly a small number of staff are expected to qualify for a religious exemption*." (emphasis added).

22.    Defendant printed and distributed this message that it would only grant a "*small number*" of the religious exemptions, as it and its related corporations

simultaneously argued the opposite in Federal Court in Minnesota.  Defendant argued in Federal Court that Plaintiffs alleging to be harmed as a result of the newly implemented Vaccine Mandate had no justiciable controversy, no standing, and the Court had no subject matter jurisdiction because Defendant granted nearly all requests for religious exemptions, and therefore few or no employees would actually be terminated.  Defendant argued that "*the only competent record evidence show that current Mayo employees' declinations [requests for exemption to vaccine] will not be 'denied*,'" and that "*Mayo has granted 90% (27 of 30) of new employees' requests for religious exemptions.*" *Def. Mayo Memo in Opp. To Mot. For TRO, filed October 8, 2021*.1

23.    In Federal Court, Defendant succeeded in convincing the Court there was no subject matter jurisdiction, because unvaccinated employees had not been terminated as of that time (October 2021), and likely would not be terminated because of Defendant's generous granting of religious exemptions.  As a result of Defendant's representations to the Court, Defendants in that case obtained dismissal without prejudice of the Complaint in that case.

---

1 *Mary Roe 1, et al., v. Allina Health Systems, et al*., (including Mayo Clinic), Case 0:21-cv-02127, filed October 8, 2021.  Defendant Mayo also wrote that it "*has not terminated or threatened to terminate any employee for failing to obtain Covid-19 vaccination or seeking an exemption*," pp. 5-6; "*all but one [of the plaintiffs] have requested exemptions that, if granted, will allow them to remain unvaccinated and employed*,"  pp. 7-8;  "*they [unvaccinated Mayo employee plaintiffs] have not suffered any harm and may never suffer any harm*," p. 8, 10; "*Plaintiffs cannot secure standing with vague allegations that exemptions under some (unidentified) vaccination policies are 'narrow' and 'limited*,'" p. 11; and "*rank speculation that an exemption could be denied does not confer standing.*" P. 11. (emphasis in original).

24.     Shortly after achieving victory in Court on the basis that it had generously granted 90% of the requests for religious exemptions, Defendant then switched to its new position that it would grant only a "*small number*" of the requests for religious exemptions, and terminate those employees who refused to receive the vaccine. Defendant then denied Plaintiff's requests for a religious exemption—without even talking to the Plaintiff about her religious beliefs—and then terminated Plaintiff, representing a complete change in Defendant's company policies and a switch from its representations to the Court in the Federal Court litigation in Minnesota.

25.     Defendant further wrote: "*applications for a religious exemption will be denied if the panel determines the applicant <u>does not demonstrate a sincerely held religious belief</u>,* (emphasis added). Defendant thus put themselves in the position of deciding the sincerity of the religious belief of their employees, including Plaintiff and, whether those beliefs were "religious" or not, and "sincere" or not. Defendant exercised this determination of the sincerity of Plaintiff's religious beliefs without ever interviewing the Plaintiff or discussing with Plaintiff her religious beliefs.

26.     Defendant also expressed limitations to the "*medical exemption*" to the Vaccine Mandate by stating: "*The only absolute medical contraindications to vaccination for COVID-19 are severe or immediate reaction to a prior dose of the vaccine, known allergy to a vaccine component, or a preexisting and clinically diagnosed fear of needles.*" Other medical conditions were preemptively discounted, or disregarded, and its physicians were ordered to ignore their clinical judgment (in violation of their oath and ethical duties as physicians) and limit their medical exemptions to these issues only.

27.     The pre-determined limitations on their religious and medical exemption policies were supposed to be kept in the dark, as Defendant wrote to the high-ranking personnel who were to implement the policies: "*This message is intended for regional supervisors, managers and other leaders, so please do not share broadly*." (emphasis added).

28.     Consistent with Defendant Mayo's instructions that employees could request a religious exemption to the Covid-19 Vaccine Mandate, Plaintiff Palecek requested a religious exemption from Defendant that Defendant denied.  Plaintiff Palecek also submitted a request for reconsideration, which Defendant Mayo also denied. Defendant Mayo did not provide Plaintiff Palecek with the criteria it used in evaluating her request for a religious exemption, nor did Defendant Mayo provide specific information regarding the reasons for the denial of Plaintiff Palecek's request for a religious exemption.

29.     Plaintiff Palecek is a Roman Catholic who has strong Catholic moral beliefs and values.  Her Catholic beliefs affect all parts of her life, especially her beliefs on marriage, children, and family.  Her family engages in Catholic rituals (Baptism, Confirmation, Marriage, Eucharist (Mass), and Confession, to name some.  They celebrate religious holidays and help those in need, consistent with their Catholic beliefs. Her beliefs are consistent with the ecclesiastical authority of the Church and the law of God within one's heart.  She follows Catholic teaching from the Catechism of the Catholic Church, Encyclicals, and other authority.

30.    Plaintiff Palecek believes that she is morally responsible to protect her life and the lives of others.  She has concerns about the safety of the Covid-19 vaccines because of the lack of studies on the long term effects of the Covid-19 vaccines, as well as their impact on her unborn child's well-being (she was pregnant when required by Defendant to receive the Covid-19 vaccine).  She also believes, consistent with the Catholic Church that the "human person … should act on their own judgment, enjoying and making use of a responsible freedom, not driven by coercion but motivated by a sense of duty," citing the Encyclical, *Dignitatis Humanae*, 1965.  She has used other protective measures to protect herself and others, which are consistent with her religious beliefs, but taking the Covid-19 vaccine would violate her religious beliefs.  She has made the decision not to receive the vaccine for the safety of herself and her family.

31.    Plaintiff Palecek believes she is required to follow her own "judgment" of conscience, and that this is supported by the Catechism of the Catholic Church which says: "Man has the right to act in conscience and in freedom so a personally to make moral decisions.  He must not be forced to act contrary to his conscience.  Nor must he be prevented from acting according to his conscience, especially in religious matters." *Catechism § 1782*.

32.    Her concerns about the safety of the Covid-19 vaccines are rooted in her religious beliefs, and include her examination of the risks verses benefits of the Covid-19 vaccine.  Plaintiff Palecek's hesitancy to take the vaccine because of "safety" and

"health" and "risk" concerns, *is part of her Catholic belief system*, which is also described in the Catechism.[2]

- "*Human life is sacred* because from its beginning it involves the *creative action of God* …" *See attached as Ex. 1, Catechism  § 2258.*

- "*Everyone is responsible for his life* before God who has given it to him. … We are obliged to *accept life gratefully and preserve it for his honor* and the *salvation of our souls*.  We are *stewards, not owners, of the life God has entrusted to us*." *Ex. 1, § 2280.*

- "Life and physical health are precious *gifts entrusted to us by God*.  We must *take reasonable care* of them …".  *Ex. 1, § 2288.*

- "the *virtue of temperance* disposes us to avoid every kind of excess" including "*medicine*."  *Ex. 1, § 2290.*

- "*Science and technology* by their very nature require unconditional respect for *fundamental moral criteria*." *Ex. 1, § 2294.*

- "*Experimentation on human beings* is *not morally legitimate* if it exposes the subject's life or physical and psychological integrity to *disproportionate or avoidable risks*.  *Experimentation on human beings* does not conform to the *dignity of the person* if it takes place *without the informed consent* of the subject or those who legitimately speak for him."  *Ex. 1, § 2295.*

*Exhibit 1 (emphasis added).*

33.    Plaintiff Palecek's religious beliefs include that she views her life as "sacred" (§ 2258), her "physical health" is a "precious gift entrusted by God" (§ 2288), that she takes seriously her obligation to be "responsible" for her life, to "take reasonable care" for her body, and to "preserve it for his honor." (§§ 2280, 2288).  She believes that taking medicines or vaccines that are unnecessary violate the "virtue of temperance," and

---

[2] The Catechism is the source of many of her religious beliefs.

could endanger her health.  (§ 2290). She believes that "science and technology" including medicine require the application of "fundamental moral criteria" (§ 2294), which in the case of the Covid-19 vaccines, requires her to reject the vaccines.  She viewed the Covid-19 vaccines as "experimentation,"[3] and that receiving them would be "disproportionate" to the "risks" associated with taking the vaccines.  Her religious beliefs are a "comprehensive" set of beliefs and principles by which she orders and lives her life.

34.    Negative side effects of the Covid-19 vaccines are well known and even warned of in the vaccine literature and CDC "Fact Sheets."[4]  The government VAERS system also tracks Covid-19 injuries, illnesses, and deaths.

---

[3] The vaccines were all passed as Emergency Use Authorization.  Though the Pfizer vaccine was given FDA approval in August 2021, it was not, in at least the first year or so—the applicable period for Plaintiff Bube's consideration—even available in the United States.  Thus, her potential receipt of the vaccine would have meant she literally and legally would have taken the vaccine "experimentally," which provided her with additional religious reasons not to take it.

[4] **Pfizer**: severe allergic reaction; rash, itching, hives, or swelling of the face; myocarditis (inflammation of the heart muscle) and pericarditis (inflammation of the lining outside the heart); injection site pain, tiredness, headache, muscle pain, chills, joint pain, fever, injection site swelling, injection site redness, nausea, feeling unwell, swollen lymph nodes, diarrhea, vomiting, and arm pain have occurred according to Pfizer's Fact Sheet. https://labeling.pfizer.com/ShowLabeling.aspx?id=14477. (revised 8 December 2022) (last accessed 12/9/22);  **Moderna:** "injection site pain, tenderness and swelling of the lymph nodes in the same arm of the injection, swelling (hardness), and redness; fatigue; headache; muscle pain; joint pain; chills; nausea and vomiting; fever; and rash. … Cases of myocarditis and pericarditis have rarely been reported in some people." https://www.cdc.gov/vaccines/covid-19/eui/download/Moderna-Caregive.pdf. (version 9/02/2022) (last accessed 12/9/22).  **Johnson & Johnson**: injection site reactions including pain, redness of the skin and swelling; headache, feeling very tired, muscle aches, nausea, and fever; swollen lymph nodes, blood clots; unusual feeling in the skin such as tingling, persistent ringing in the ears (tinnitus); diarrhea, vomiting; severe allergic reaction, including difficulty breathing, swelling of face and throat, fast heartbeat, bad rash, dizziness and weakness; shortness of breath, chest pain, leg swelling,

35.    Her religious beliefs are sincerely held, as indicated by among other things, that she would rather have been terminated from her employment than receive the Covid-19 vaccine.

36.    Plaintiff Palecek received positive job performance reviews from Defendant.  Plaintiff followed all PPE protocols, worked long hours, and exceeded Defendant's demands.

37.    Plaintiff Palecek proposed a reasonable accommodation to continue working as she had for the prior year and a half with no undue hardship to Defendant. Plaintiff Palecek proposed to continue working with masking, distancing, submitting to frequent PCR testing, using additional personal protective equipment, and utilizing other measures as business circumstances warrant. Defendant Mayo did not respond to her request for accommodation.

38.    Plaintiff contracted Covid-19 in December 2021 and recovered, which has provided her with natural immunity.

39.    Plaintiff Palecek is familiar with persons who have taken the Covid-19 vaccines and become ill shortly after taking the vaccines.  For example, Plaintiff is familiar with the following people:

- A woman who took the vaccine during her first trimester of her pregnancy and subsequently suffered a miscarriage;
- A person who suffered an aneurysm, worsening migraines, and hormonal issues;

persistent abdominal pain, severe or persistent headaches or blurred vision, easy bruising; thrombosis with thrombocytopenia, Guillain-Barre syndrome. https://www.fda.gov/media/146305/download (revised May 5, 2022) (last accessed 12/9/22).

- A person who developed seizures shortly after receiving the vaccine;
- A child that has physical developmental issues requiring physical therapy and occupational therapy services, along with rapid growth (the child's mother was pregnant at the time she received the vaccine);
- A person who had severe sensitivity to light and sound requiring isolation, and also developed serious headaches;
- A person who developed pain and digestive issues.

40.    Plaintiff has never been determined to have transmitted Covid-19 to any patients or co-workers.

41.    Plaintiff Palecek was granted a religious exemption to the flu vaccine in December 2021, due to her sincerely held religious beliefs.

42.    Plaintiff Palecek was terminated for refusing to take the Covid-19 vaccine.

43.    After Defendant denied Plaintiff's requests for religious exemption to the Covid-19 vaccine, Defendant also warned the Plaintiff: "*Do not distribute, forward, or copy the content of this notification.*"

44.    Defendant Mayo terminated Plaintiff Palecek's employment on April 29, 2022 based on her refusal to take the Covid-19 vaccine.  Plaintiff Palecek filed a charge of religious, age, and disability discrimination with the EEOC and with the State of Wisconsin Department of Workforce Development Equal Rights Division.  Plaintiff Palecek received a Right to Sue letter from EEOC on February 23, 2023.

45.    Plaintiff Palecek was terminated because of her religious beliefs which prevented Plaintiff Palecek from receiving the Covid-19 vaccine.

46.    Upon information and belief, Plaintiff Palecek was replaced by an employee who did not have sincerely held religious beliefs that resulted in an objection to receiving the Covid-19 vaccine.  The replacement for Plaintiff was significantly younger,

13

with minimal experience, and lower level of licensure, and therefore at a lower salary and benefits package.

47.    Plaintiff Palecek was treated differently than other employees of Defendant because of Plaintiff Palecek's sincerely held religious beliefs.

48.    Defendant created an ad hoc panel to review such exemption requests, but kept the identity of the panelists secretive, so as to prevent examination of the guidelines and criteria Defendant used in evaluating the requests for religious exemptions. Defendant wrote: "*individual names [of the ad hoc panelists] are confidential and will not be shared*."

49.    Plaintiff has sincerely held religious beliefs, and submitted a request for exemption, but Defendant accepted very few religious exemptions, with the exception that some were granted, but conditioned upon submission to invasive, supervised weekly testing despite the fact that the vaccinated and unvaccinated people contracted and transmitted both the Delta and Omicron variants at similar rates.

50.    Defendant's forms for requesting religious exemptions were written in a deceptive way to force applicants into accepting false statements as true, and then trying to force applicants for religious exemptions into admitting "inconsistencies" that Defendant could use to deny the request for religious exemptions.  Defendant's forms also limited the length of the request for an exemption to 500 characters, which prevented Plaintiff from fully explaining her comprehensive religious beliefs.

51.    As a result of Defendant Mayo's policy on restricting religious and medical exemptions, very few people qualified for those exemptions, resulting in mass

14

terminations for those employees, including Plaintiff, who refused the Covid-19 vaccination, and whom Defendants terminated as a result.

52.     Plaintiff had worked for Defendant for over one and one-half years during the Pandemic prior to the Vaccine Mandate, and Plaintiff had fully performed her employment duties and even obtained positive and glowing job performance reviews, without being discriminated against.

53.     Defendant Mayo's denials of requests for religious exemptions all contained the same boilerplate language:

> *Thank you for submitting your request for religious exemption. The information you provided was carefully considered. While this may not be the news you were hoping to receive, your religious accommodation has not been approved. Based on the information provided, your request did not meet the criteria for a religious exemption accommodation.*

54.     Defendant engaged in no case-by-case analysis or individualized interactive process to discuss Plaintiff's exemption requests or possible accommodations. In response to requests for explanation or information, Defendant wrote: "*HR is not able to share what criteria was used to review/approve the exemption. A small team of employees reviewed each request and based on what was provided to them from each individual employee is what was used in the approval/denial decision.*"

55.     Rather than engaging in a legitimate interactive process, respecting the sincerity of Plaintiff's religious beliefs, or attempting reasonable accommodation, Defendant used more boilerplate language to justify its pre-determined result:

> *Generally, denials occur because the requestor has not clearly stated their sincerely held belief, demonstrated it is a sincerely and*

15

> *consistently held belief, and/or clearly defined the conflict between their religious belief and receiving the COVID-19 vaccine*.

56.     Defendant actually specifically disavowed an individual interactive process by writing: "*Specific feedback on individual requests will not be provided*," and "*it is not possible to provide individual feedback*."

57.     Defendants had an enforceable policy of honoring diversity, equity and inclusion, including the protection of the religious rights of its employees.  Defendants promised this policy applies "to all employees" and required Defendants to "comply with" all "federal and state laws," and promised that the consequence of "failure to comply with" this promise of non-discrimination was "corrective action up to and including termination of employment."

58.     Defendants' policy protected all employees' "sincerely held religious beliefs," and "prohibits disparate treatment, job segregation, or harassment based on religious belief, observance, or practice."

59.     Defendants promised that their employees' "religion" "includes all aspects of religious belief, observance and practice."

60.     Defendants' stated enforceable policy, conveyed company-wide was that Mayo is "committed to upholding laws prohibiting discrimination and/or harassment on the bases of race, color, creed, *religion*, gender, *age*, national origin, marital status, sexual orientation, veteran's status, *disability*, or status with regard to public assistance." (emphasis added).

61.    Plaintiff sought further clarification on Defendant's criteria for determining whether a religious belief constituted a "sincerely held religious belief," and the basis for Defendant's determination that Plaintiff did not have a "sincerely held religious beliefs," but the Plaintiff was simply given the generalized, identical language in the letters.

62.    In its form denial letters, Defendant announced that it would accept appeals of its uniform denial decisions. "*If you would like to submit additional clarifying information, you may submit a reconsideration request here*."  Plaintiff took advantage of that process and submitted additional information supporting her request for exemption.

63.    Defendant required appeals to be made within 48 hours.  The denials were frequently e-mailed and not hand delivered despite the fact that the employees' jobs were at stake.  Many employees did not have access to work e-mail at home, and therefore may not have even gotten the notice of the denial of their request for the religious exemption until they returned to work, after the 48 hours had run.  Others were on vacation, or engrossed in work or family responsibilities when the notice of denial of their request for religious exemption came, and thus failed to make an appeal with the 48-hour period.

64.    Plaintiff followed the appeal process but her request for reconsideration was denied, as were most, with the exception of those whose exemptions were conditioned on their undergoing testing and agreeing to release medical information to third parties.  Defendant again issued identical denial letters to nearly every employee who appealed.  The transmittal email messages stated: "*Unfortunately, the additional information you provided did not change the outcome as it did not meet the criteria for a*

17

*religious accommodation*."  Again, no interactive process was used to evaluate the requests for exemptions.

65.  Defendant did not provide information about its process for determining whether Plaintiff's religious beliefs were sincerely held or not, or whether Plaintiff's sincerely held religious beliefs would be accommodated either.

66.  Both the original denial of the religious exemption and the denial of the request for reconsideration contained this warning at the bottom: "*Do not disseminate, distribute, forward, or copy the content of this notification*."

67.  Defendant further instructed its staff to "*endorse the vaccine or say nothing*."

68.   The Plaintiff submitted a good-faith statement of her sincerely-held religious beliefs, with explanations of how her faith constrained her from accepting the Covid-19 vaccination.  Defendant's ad hoc panel nevertheless denied Plaintiff's request for an exemption and made no effort to accommodate her request for a religious exemption.

69.  Defendant did grant religious exemptions to some of its employees. However, those employees were frequently required to undergo weekly testing for the Covid-19 virus.

70.  Defendant, in issuing its Vaccine Mandates, instructed that all of its employees must be "fully vaccinated," despite the fact that the phrase "fully vaccinated" has changed over time to include receiving one shot, or two shots, and then discussion of three shots, and even additional or annual shots.

18

71.     Defendant issued the Vaccine Mandate mandating its employees, including Plaintiff, take the Covid-19 vaccine despite evidence that the Covid-19 vaccines did not prevent infection or transmission, did not provide protection as long lasting as had been previously represented, and only allegedly reduced the severity of Covid-19 if a person contracts Covid-19.

72.     On August 6, 2021, CDC Director Dr. Rochelle Walensky stated that Covid-19 vaccines did not prevent transmission of SARS-CoV-2 variants (Virus).[5]  This followed the CDC's updated guidance and Dr. Walensky's comments on July 27, 2021, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status. This decision was made based on data and science "published in CDC's *Morbidity and Mortality Weekly Report (MMWR)*, demonstrating that *Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus*."[6] (emphasis added).

73.     Dr. Deborah Birx, the former White House Covid Response Coordinator, stated in July 2022: "*I knew these vaccines were not going to protect against infection.*

[5] https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022).
[6] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, Centers for Disease Control and Prevention (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (emphasis added). See also, https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html. (last accessed November 8, 2022); https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

*And I think we overplayed the vaccines …*".  Separately Dr. Birx also stated: "*When we make broad statements, when we say to people that these vaccines are going to protect against infection – one, it wasn't studied*, …".

74.     President Biden stated: "*If you get vaccinated, you won't get Covid.*" However, President Biden has been vaccinated and boosted, yet has contracted Covid-19 at least twice.  Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, who has been vaccinated and boosted, yet has contracted Covid-19, made the statement that "*when people are vaccinated, they can feel safe they will not be infected.*"  Center for Disease Control Director Dr. Rochelle Walensky, who has been vaccinated and boosted, yet tested positive for Covid-19 as recently as October 2022, stated: "*vaccinated people do not get sick … do not spread the virus.*"

75.     The Centers for Medicare and Medicaid Services ("CMS") also recognized in its regulations that it was not even known if the vaccines worked, which the CDC and Dr. Birx also acknowledged as set forth above.  *See, 86 Fed. Reg. at 61615 (Nov. 5, 2021)* (acknowledging that "the duration of vaccine **effectiveness in preventing Covid-19, reducing disease severity, reducing the risk of death, and the effectiveness of the vaccine to prevent disease transmission by those vaccinated <u>are not currently known</u>**."  (emphasis added).

76.     These uncertainties and doubts are repeated throughout the CMS regulations:

- "Like most vaccines, **COVID-19 vaccines are not 100 percent effective in preventing COVID-19. Consequently, some "breakthrough" cases are expected** and, as the number of people who have completed a primary

20

vaccination series and are considered fully vaccinated for COVID-19 increases, breakthrough COVID-19 cases will also increase commensurately." 61565 (emphasis added).

- **"There are also <u>several unknowns</u> that may affect current progress or this rule or both. These include the duration of strong vaccine protection with or without a booster shot and the possibility of new virus variants that reduce the effectiveness of currently authorized and approved vaccines. We <u>cannot estimate</u> the effects of each of the possible interactions among them, but throughout the analysis we point out some of the most important <u>assumptions</u> we have made and the possible effects of <u>alternatives to those assumptions.</u>"** 61603 (emphasis added).

- **"There are <u>major uncertainties in these estimates</u>. One obvious example is <u>whether vaccine efficacy will last</u> more than the approximately 1 year proven to date and whether boosters are needed.[FN244] Some in the scientific community believe that "booster" vaccinations after 6 or 8 months would be desirable to maintain a high level of protection against the predominant Delta version of the virus. <u>Delta may be overtaken</u> by other virus mutations, <u>which creates another uncertainty</u>. Booster vaccination or use of vaccines whose licenses or EUAs have been amended to address new variants would likely maintain the effectiveness of vaccination for residents and staff."** 61609 (emphasis added).

- "All these <u>data and estimation limitations</u> apply to even the short-term impacts of this rule, and **<u>major uncertainties remain</u> as to the future course of the pandemic, including but not limited to <u>vaccine effectiveness in preventing "breakthrough" disease transmission from those vaccinated, the <u>long-term effectiveness of vaccination</u>, the <u>emergence of treatment options</u>, and the potential for some <u>new disease variant</u> even more dangerous than Delta."** 61612 (emphasis added).

- "As explained in various places within this RIA and the preamble as a whole, **there are major uncertainties as to the effects of current variants of SARS-CoV-2 on future infection rates, medical costs, and prevention of major illness or mortality**. … T**hese uncertainties also impinge on benefits estimates."** 61615 (emphasis added).

77.    Vaccination does not prevent infection or transmission of Covid-19, and

Defendant's Vaccine Mandate did not support Defendant's claimed policy of keeping its

patients and employees safe.  For many months, the CDC has no longer differentiated between vaccinated and unvaccinated individuals.[7]

78.     The majority of people with Covid-19 were vaccinated to one extent or another.

79.     A recent study indicates that people who took the Covid-19 vaccine are actually more likely to be hospitalized than people with natural immunity.

80.     The number of patients hospitalized because of Covid-19 positive status has also been overstated because many were hospitalized for other causes, not because of Covid-19.

81.     Similarly, the number of people who were counted as having died from Covid-19 were overstated because many of them died *with* Covid-19, not *from* Covid-19.

82.     The number of Covid-19 deaths were also overstated by upwards of 25%, or even more, because many of those who died had multiple co-morbidities.

83.     Dr. Deborah Birx stated "[b]ut let's be very clear: 50% of the people who died from the Omicron surge were older, vaccinated."

84.     The VAERS system has documented that the vaccines themselves, have numerous harmful side effects associated with them.  Some of these harmful side effects are included in the lists of side effects described right in the vaccine literature for each of the available vaccines.

---

[7] https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html. (last accessed November 8, 2022).

85.    Thus, the extent of Covid-19 infections, the severity of the Covid-19 infection, the efficacy of the vaccines, and the time-length of vaccine protection may all have been overstated, contributing to an over exuberance in mandating vaccines, and punishing the unvaccinated, as Defendants have done as set forth above.

86.    Early on in the Covid-19 pandemic, and before any vaccines were available, Defendant Mayo provided free testing to determine "*how many Mayo Clinic staff have developed antibodies against SARS-Co-V-2.*" Defendant Mayo has subsequently stopped providing this testing because the demonstrated superiority of natural immunity to vaccinated immunity, might encourage its employees to decline the vaccine.

87.    Rather than disclosing the results of its determination on the numbers of Defendant's "*staff*" that "*have developed antibodies against SARS-Co-V-2,*" or disclosing studies on the "*duration of immunity after Covid-19,*" (which some studies have asserted are many times more effective than vaccine immunity), Defendant has not made public this information and instead issued the Vaccine Mandate.

88.    Further, Defendant quit providing the antibody testing—whether free or paid—which deprived Defendant of important information as to whether the vaccine was necessary for its employees in the first instance, whether Defendant's employees needed accommodation, and whether Defendant would incur any hardship by continuing to employ unvaccinated employees.

89.     The State of Minnesota ceased to be under a state-declared "emergency" over three months before Defendant instituted its Vaccine Mandate, as Governor Timothy Walz officially ended the State's emergency effective June 30, 2021.

90.     On March 8, 2022, Defendant announced it would suspend the testing program portion of the Vaccine Mandate.  As a result, Defendant's remaining unvaccinated employees are now treated similarly to vaccinated employees, but Plaintiff was treated discriminatorily.

91.     After terminating the Plaintiff, and discriminating against employees related to testing, Defendant suspended weekly testing effective March 14, 2022, which means that those who refused weekly testing and were terminated between January 2022 and March 14, 2022, would no longer be forced to test weekly, and would no longer be terminated for objecting to testing, which Defendant has now determined is unnecessary.

92.     After terminating the Plaintiff, and in some cases before Defendant terminated other employees, Defendant began hiring other, unvaccinated employees.  In some cases Defendant hired new, unvaccinated employees after Defendant had terminated unvaccinated employees; and in other cases Defendant hired unvaccinated employees before it had terminated other unvaccinated employees, who were terminated for refusing to become vaccinated.

93.     The following seriatim list of facts which have been gathered by Plaintiff suing Defendant and its related entities, which casts doubt on the legitimacy of the exemption process are as follows:

- The exemption process, and particularly the appeal process were under an

unnecessary short timeframe negatively affecting the quality of the exemption submissions.  There was no reason for the unnecessary shortness of the timeframe.  During that period, Delta and Omicron were the dominant variants in October 2021/January 2022, and the Defendant and the CDC were aware that the Covid-19 vaccine did not materially prevent infection, or transmission of those Covid-19 variants during that time period.

- The antibody testing to determine prior Covid-19 infection, and infection resistance that the CDC determined was many times superior to vaccinated immunity was terminated over the objection of the workforce, and demonstrated that the purpose of the Vaccine Mandate was not to further patient safety.  The refusal to acknowledge that Covid-19 recovered immunity was superior to vaccinated immunity demonstrated that the process was not created with patient safety being a primary concern.

- Defendant Mayo terminated a mother of two daughters who introduced her daughters to their religious faith, while granting the religious exemptions of her lower paid daughters.

- Defendant Mayo terminated numerous spouses who went to church with their fellow spouse while granting the religious exemption of the other spouse, and in one such instance, and on information and belief, their exemption requests contained *the exact same language*.

- Defendant Mayo terminated some parishioners at a parish while granting the religious exemptions of others who attended the exact same parish.

- Defendant Mayo's lack of an interactive process favored superior writers over inferior writers, something which has absolutely no bearing on the sincerity of an exemption proponent's religious faith.

- Workers who were working remotely during their entire tenure, and who were absolutely no risk to their colleagues, or patients, were terminated, providing direct evidence that the entire exemption process was absurd and conducted in bad faith.

- Within two months of terminating Plaintiff, Defendant Mayo was again hiring unvaccinated employees, demonstrating further that the purported

25

reasons for the vaccine mandate were not patient safety and that the stated reasons for Plaintiff's terminations were a pretext.

## FIRST CAUSE OF ACTION

### Religious Discrimination and Failure to Accommodate under Title VII of the Civil Rights Act of 1964

94.    Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

95.    Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

96.    Plaintiff is an "employee" within the meaning of 42 U.S.C. § 2000e(f).

97.    Plaintiff has a sincerely held religious belief which prevented her from receiving the vaccine.  Plaintiff's beliefs arise because of her religious beliefs.

98.    Plaintiff has a sincerely held religious belief which makes her a member of a protected class.

99.    Plaintiff was qualified for the job position which she held prior to being terminated.

100.    Plaintiff informed the Defendant employer of the conflict between her religious beliefs and receiving the Covid-19 vaccine.

101.    Title VII of the Civil Rights Act prohibits discrimination on the basis of religion. Id. § 2000e-2. The Act further requires covered employers to provide reasonable accommodation to their employees' sincerely held religious beliefs. Id. § 2000e(j).

102.    Title VII prohibits Defendant from scrutinizing what Defendant believes to be the sincerity of Plaintiff's religious beliefs, or whether Plaintiff's exercise of her beliefs is logical or as consistent as Defendant believes they should be.

26

103.    Guidance issued by the Equal Employment Opportunity Commission and decisions of the federal courts require that requests for reasonable accommodation be considered based on their individual, particularized circumstances, and that any claim of undue hardship or "direct threat" by the employer be assessed on a case-by-case basis rather than through application of a blanket rule.

104.    Plaintiff, in her request for accommodation from Defendant's Vaccine Mandate, made individualized requests for accommodation, but instead was terminated.

105.    In response to the Plaintiff's request for reasonable accommodation of her sincerely-held religious beliefs, Defendant and its ad hoc panel applied a uniform, blanket rule in rejecting nearly all, in violation of both Title VII and the EEOC's persuasive guidance on reasonable accommodation.

106.    Despite the Plaintiff's consistent requests for Defendant to engage in an interactive process regarding the requests for accommodation, Defendant refused throughout to engage in the interactive process and instead rejected Plaintiff's request for an exemption for identical reasons as other Defendant's employees using an identical form letter.

107.    As set forth above, Defendant could have accommodated Plaintiff's requests for a religious exemption without suffering any undue hardship by having her continue to do her job the same as she had done for the last one and one-half years of her employment, during the pandemic.

108.    Defendant's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C. §§ 2000(e)-2 and 2000(e)(j).

109.    Because of Defendant's unlawful actions, Plaintiff suffered and continues to suffer economic and other damages in amounts to be proven at trial, including front pay, back pay, expected raises for promotions, tuition reimbursement, emotional distress damages, compensatory damages, punitive damages, and attorney fees in excess of $75,000.

## SECOND CAUSE OF ACTION
### Breach of Contract/Promissory Estoppel

110.    Plaintiff restates and realleges all previous allegations as if fully set-forth herein.

111.    Defendant had a policy of honoring diversity, equity and inclusion, including the protection of the religious rights of its employees.

112.    Defendant's enforceable policy included the protection of the religious rights of its employees. Defendants promised this policy applies "to all employees" and required Defendants to "comply with" all "federal and state laws," and promised that the consequence of "failure to comply with" this promise of non-discrimination was "corrective action up to and including termination of employment."

113.    Defendants' policy protected all employees' "sincerely held religious beliefs," and "prohibits disparate treatment, job segregation, or harassment based on religious belief, observance, or practice."

114.    Defendants promised that their employees' "religion" "includes all aspects of religious belief, observance and practice."

115.    Defendants' stated enforceable policy, conveyed company-wide was that Mayo is "committed to upholding laws prohibiting discrimination and/or harassment on the bases of race, color, creed, *religion*, gender, *age*, national origin, marital status, sexual orientation, veteran's status, *disability*, or status with regard to public assistance." (emphasis added).

116.    Defendant's policies and statements created a contract between it and its employees.

117.    Defendant's actions in terminating Plaintiff, discriminating against her on the basis of her religious beliefs, constitutes a breach of that contract.

118.    Plaintiff has been damaged by Defendant's breaches of contract.

119.    In the alternative, Defendant's promises to its employees, both written and verbal, created an expectation on which the employees, including Plaintiff, relied to her detriment. Defendant's promises to its employees, including Plaintiff, should be enforced to avoid injustice.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues for which she has a right to trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff above-named prays for judgment in her favor and against Defendant and for an Order of the Court as follows:

1.      Adjudging that Defendant is liable to Plaintiff for her actual damages in an amount to be proven at trial, including front pay, back pay, expected raises for

29

promotions, treble damages and statutory penalty, interest, emotional distress and pain and suffering, compensatory damages, punitive damages, and any damages or penalties available at law;

2.  Enjoining Defendant from taking further illegal action against Plaintiff in violation of both state and federal law, and Ordering Defendant to take action to restore Plaintiff to her financial position she would have enjoyed absent Defendant's illegal conduct;

3.  Awarding Plaintiff her costs, attorney fees, prejudgment interest, and any other relief permitted by statute; and

4.  Awarding such other relief as the Court may deem just and equitable, including, without limitation, an injunction prohibiting differences in treatment between the vaccinated and unvaccinated which do not have a scientific basis.

Dated: May 19, 2023

*s/Gregory M. Erickson*
Gregory M. Erickson, 276522
Vincent J. Fahnlander, 19220X
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Email: erickson@mklaw.com
Email: fahnlander@mklaw.com
*Attorneys for Plaintiffs*

30